## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| SHANNON RAY CHAPMAN | ) | |
| and | ) | |
| DONNA JEAN CHAPMAN, | ) | CASE NO. 05-71881 |
| | ) | |
| DEBTORS | ) | |

### MEMORANDUM DECISION

The matter before the Court is the United States Trustee's Motion to dismiss the Debtors' case as constituting alleged "substantial abuse" pursuant to 11 U.S.C. § 707(b). In this Motion filed June 23, 2005 the United States Trustee ("U.S. Trustee") alleges that the Debtors, Shannon and Donna Chapman, by incurring excessive consumer debt at a time when they were not paying their existing consumer debt obligations and by understating their petition date income in their bankruptcy schedules have filed a Chapter 7 petition constituting substantial abuse of that chapter of the Bankruptcy Code and therefore their case should be dismissed unless they choose to file a motion to convert their case to one under Chapter 13 of the Code. The Debtors filed their petition on May 12, 2005 and therefore this case is controlled by the law in effect prior to the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). The matter was set for trial and heard on January 18, 2006. The matter has been fully briefed by the parties and is now ready for decision. For the reasons stated below, the Court will conditionally deny the U.S. Trustee's motion.

FINDINGS OF FACT

Federal Rule of Bankruptcy Procedure 1017(e)(1) requires the United States

Trustee with regard to a motion to dismiss for alleged substantial abuse to "set forth in the

motion all matters to be submitted to the court for its consideration at the hearing." The matters

relied upon by the United States Trustee may be summarized as follows. Mr. Chapman has been

steadily employed in the coal mining industry, having earned $71,707 in 2003 and $77,288 in

2004, which earnings were disclosed in the Debtors' Statement of Financial Affairs. In addition

their tax returns indicated rental income of $2,215 in 2004 and business income of $2,196 in

2003. They lived in a home purchased within the last three years preceding the bankruptcy filing

and reported petition date indebtedness of "approximately $48,000" for two vehicles purchased

in April and November of 2004, the latter of which was approximately six months prior to their

May 12, 2005 bankruptcy filing. In addition the Debtors purchased other personal property

(furniture) in February 2005, upon which they owed $755 at the time of their chapter 7 filing.

They reported unsecured debts of $26,177.82, mostly involving credit cards and personal loans.

Their filing was not precipitated by any calamity, litigation or repossession. The Debtors are

alleged to have understated Mr. Chapman's income on Schedule I and to have overstated their

monthly expenses, including $600 for food, $100 for recreation, $350 for transportation expenses

(not including vehicle payments or insurance) although only Mr. Chapman was employed. They

purportedly have the ability to repay "a significant percentage of their unsecured debt in 36

months." They are asserted to have lived beyond their means and as a result have incurred

excessive consumer debt, including two personal loans totaling $4,000 in the months leading up

to their filing.

On the Debtors' Schedule I, Mr. Chapman reported a gross monthly income of $4,857.66, less payroll deductions of $1,138.60 for income and social security taxes for a net monthly income of $3,719.06. Mrs. Chapman reported no income.

On the Debtors' Schedule J, they listed monthly expenses of $3,976.49, approximately $257 more than their reported net income. They reported no dependents, although they have a daughter in college. The itemization of the reported monthly expenses is as follows:

| | |
|---|---|
| Mortgage Payment | $735.00 |
| Electricity and Heating Fuel | 120.00 |
| Water and Sewer | 50.00 |
| Telephone | 50.00 |
| Satellite and Cell Phone | 90.00 |
| Home Maintenance (repairs and upkeep) | 125.00 |
| Food | 600.00 |
| Clothing | 120.00 |
| Laundry and Dry Cleaning | 100.00 |
| Medical and Dental Expenses | 75.00 |
| Transportation (not including car payments) | 350.00 |
| Recreation | 100.00 |
| Charitable Contributions | 100.00 |
| Life Insurance | 40.00 |
| Auto Insurance | 180.00 |
| Auto Payment | 497.77 |
| Truck Payment | 568.72 |
| Furniture Payment | 75.00 |
| **Total Expenses** | **$3,976.49** |

In their Statement of Intention with respect to their secured obligations the Debtors stated that they intended to retain their mobile home, two vehicles, and a buffet and hutch and keep making the required payments on the financing for these assets. The indicated total of these monthly payments is $1,876.49. In his closing written argument to the court counsel for the United States Trustee stated that no challenge was made to the budgeted expenses other than the purchase of the Toyota truck in November of 2004 and any amounts paid by them in connection with the

legal troubles of their adult son. While the Debtors did testify that they had incurred some debt

for that specific reason, it does not appear that any such amounts are reflected in their Schedule J

expenses.

The Debtors signed their schedules on May 10, 2005. At that time Mr. Chapman

had recently taken a new job and had not yet received his initial paycheck. He testified, however,

that his promised annual salary for the new job was $65,000, which is a monthly gross amount of

$5,416.67, more than $550 per month greater than the $4,857.66 figure indicated on Schedule I.

This reason for this discrepancy was never explained at trial but in the written arguments offered

by Debtors' counsel it is stated that this figure was based on the lowest of three recent pay stubs

which Mr. Chapman had from his former job, which was a higher paying job but required

considerably more hours, and therefore that the figures used in Schedule I were the result of the

attorney's professional judgment rather than any failure of the Debtors to report their income

correctly to their counsel. In fact Mr. Chapman testified at trial in response to a question from

the Court that he had told his attorneys that his salary in the new job was to be $65,000 on an

annual basis.

Mr. Chapman's first paycheck from his new employer, Brook Run Mining, was

for the period April 18 thru May 1, 2005 and the indicated "pay date" was May 13, the day after

the Chapmans' bankruptcy petition was filed. This paycheck is consistent with a $65,000 annual

gross salary. The net amount of the check after payroll deductions was $1,876.30. The monthly

equivalent of this amount is $4,065.32. Taking the Chapmans' budget figures as presented in

Schedule J of $3,976.49 per month would mean that less than $100 per month would be available

to fund a chapter 13 plan. This clearly would not be enough to provide a substantial distribution

-4-

to unsecured creditors unless the expenses were reduced or eliminated, such as by surrendering

one of the Chapmans' vehicles and using that monthly payment for a chapter 13 plan payment.

The inducements offered by Brook Run to Mr. Chapman to leave his former employment and

come to work for it apparently were not fulfilled and Mr. Chapman later returned to Dominion

Coal. At the time of trial, Mr. Chapman's gross monthly earnings, including regular time and

normal overtime hours, were $4,792.67. The net amount was not established but presumably it

would be less than the filing date amount of $4,065.32 because it is based on a materially lower

gross amount than the filing date figure ($4,792.67 vs. $5,416.67).

Contrary to the assertion made in the United States Trustee's Motion that the

filing was not motivated by any litigation or threat of repossession, the Debtors testified that the

filing was precipitated by a garnishment of Mr. Chapman's earnings. The fact of this

garnishment is noted in the post-trial brief filed on behalf of the United States Trustee.

Accordingly, one of the premises for the filing of the Motion was plainly mistaken.

In his post-trial arguments to the Court in support of the Motion to Dismiss, the

United States Trustee has focused his attention on three main areas: material understatement of

filing date income, purchase of two new vehicles within twelve months before their filing, and

incurring other credit obligations within the months preceding their filing when their financial

problems were readily apparent.

*Misstatement of income*

The Court finds that Mr. Chapman's petition date gross income was materially

understated. The actual figure, which is entirely consistent with the information then known to

the Chapmans when the petition was signed, was $5,416.67. The reported amount was

$4,857.66, a difference of just over $559 per month, an understatement of approximately 10.3% of the correct gross income figure. The net monthly income, $4,065.32, as of the filing date was $346.26 more than the $3,719.06 figure reported on Schedule I, an understatement of approximately 8.5%. Although the actual amount of Mr. Chapman's "take-home pay" in his new job was apparently not known by the Debtors at the time they signed their petition, no testimony on their behalf was offered that any inquiry was made to determine such information and that such information would not have been available to Mr. Chapman had he asked for it. The Court further finds, however, that the Chapmans relied upon their legal counsel in the preparation of Schedule I and did not attempt to mislead either counsel or the court concerning their income. Such finding is supported by the fact that their income for the two years preceding the year of the bankruptcy filing were correctly reported in their Statement of Financial Affairs.

### Purchase of Vehicles

At a time when they were not paying credit card debts which had been incurred several years previously, the Chapmans on two separate occasions purchased new Toyota vehicles within little more than a year preceding their bankruptcy filing. The first of these, a Toyota RAV4, was purchased for Mrs. Chapman, on April 24, 2004. The transaction documentation indicates a total amount financed of $ 27,944.96 at an annual percentage rate of 13.84% over a term of 72 months. This vehicle replaced a vehicle which, according to Mrs. Chapman, was in poor condition and was incurring very large continuing repair bills. The monthly payment on the new vehicle, which according to Schedule J was $497.77 per month[1],

---

[1] According to the transaction documentation submitted as part of U.S. Trustee's Exhibit 7, however, the monthly payment amount was to be $576.74. This discrepancy was not noted at trial by the Court or explained by the parties.

was stated to be not very much different from the monthly payment then being made on the prior

vehicle, although the number of months left to pay on that vehicle was not disclosed by the

evidence. The transaction documentation, introduced as a part of United States Trustee's Exhibit

7, reflects the trade-in of a 1998 Dodge truck upon which $9,871.71 was owed and for which

$1,000 was allowed as a net trade-in.   It appears that Mrs. Chapman shopped at only one

dealership and for nothing else other than a Toyota and relied on the salesman's advice that

financing for a used car would be expensive or not available and that she would be better off to

purchase a new vehicle.  In his post-trial arguments counsel for the United States Trustee does

not take issue with the purchase of this vehicle, although Mrs. Chapman, apparently as a result of

health problems, has not worked outside of the home since 2002.  He does take issue, however,

with Mr. Chapman's purchase of a new 2005 model Toyota Tacoma pickup truck, upon which

the sum of  $24,063.55 was financed, on November 27, 2004, within six months of the

bankruptcy filing.  This purchase was made after a judgment had been obtained against the

Chapmans on July 20, 2004 in the General District Court of Russell County, Virginia on a credit

card debt owed to Great Seneca Financial (Providian).  The monthly payment on this truck

obligation is $497.77 and appears to have been an entirely new and additional obligation which

did not replace any existing obligation owed by the Chapmans upon the vehicle previously used

by Mr. Chapman for commuting to his job.  The transaction documentation of this purchase, also

a part of United States Trustee's Exhibit 7, is so light as to be almost not discernible but it

appears that there was no trade of an existing vehicle and the evidence does not disclose any

information about what happened to the vehicle Mr. Chapman had been using for job travel prior

to the purchase of the Toyota Tacoma.

*Other Consumer Debt Shortly Before Bankruptcy*

Other than the purchase of the Toyota Tacoma discussed in the preceding

paragraph, the Chapmans did not incur substantial consumer debt in the months leading up to

their bankruptcy. In fact, their credit card debt, which has been stipulated to have been consumer

in nature, dates back mostly to 2000 and none more recent than 2002. In their answers to

interrogatories posed by the United States Trustee the Debtors, by counsel, indicated that they

had incurred no charges on any of these credit cards within the preceding two years. These

answers are contained in U.S. Trustee's Exhibit 8 and this representation has not been challenged

by the United States Trustee during this proceeding. This credit card debt is comprised of eight

different accounts in the aggregate petition date balance, according to their Schedule F, of

$13,432.29. This schedule also notes debt to medical care providers in the amount of $2,169.53

and responsibility for educational loans for their daughter incurred in 2000 and 2001 for the

benefit of their daughter in the aggregate sum of $6,506. It also reflects a loan in the amount of

$3,100 obtained from SLM Financial in June, 2004 and a loan of $970 from The Bank of

Tazewell County in October, 2004. SLM Financial was the only creditor to file a proof of claim

in the bankruptcy case. Surprisingly it represents a loan transaction date of August 5, 2004,

rather than June, a filing date balance of $2,539.60, and security in an unspecified motor vehicle

said to have a value of $2,125. This proof of claim contains no supporting documentation[2]. The

Chapmans' petition contains no indication of ownership of any motor vehicles other than the

---

[2] This proof of claim was not a stipulated exhibit. Accordingly, the information it
contains is included for discussion purposes and its representations are not incorporated as
findings of fact by means of judicial notice in this decision. The fact of the filing of the proof of
claim is a matter of which the court may take judicial notice, but not the factual information it
contains. Fed. R. Evid. 201.

Toyota vehicles purchased in 2004 and reports no gifts or other transfers out of the ordinary course of business within the twelve months preceding their bankruptcy filing in their Statement of Financial Affairs.   Finally, Schedule D reports a debt to Schewel's Furniture in the amount of $755 incurred in February, 2005 for the purchase of a buffet and hutch.  In their Statement of Intention filed with their petition the Chapmans indicated an intent to retain and continue making payments on the debts for the furniture, both vehicles and their residential mortgage debt without reaffirming personal liability thereon.

*Ability to pay*

The Court  finds that Mr. Chapman's actual net monthly income at the time of filing available for debt repayment other than the secured debt which the Debtors indicated their intention to continue paying was less than $100. Even using a figure of $100 per month, however, and after allowing for a 10% expense factor for the services of the chapter 13 trustee, would mean over the course of a 36 month plan a distribution to unsecured creditors of $3,240, which would amount to less than 15% of their unsecured debt.   If the truck were surrendered, a plan providing for a $600 monthly payment would be a reasonable expectation.  Such a payment, after allowing for a 10% expense factor, would mean a distribution to creditors of $19,440, which would be approximately 74% of their unsecured debt **if** no deficiency resulted from the surrender of the truck.  Even allowing for a $5,000 deficiency, however,  would still result in a distribution of approximately 60% of the unsecured claims.

*Good Faith*

The Court finds that the Debtors filed their chapter 7 petition in good faith.  The United States Trustee makes no substantial claim to the contrary.

-9-

## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984. A motion to dismiss for substantial abuse is a "core" bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)(A).

A court may dismiss a Chapter 7 bankruptcy case upon a motion by the United States Trustee if the case is filed by a debtor with primarily consumer debts and granting relief would be a substantial abuse of Chapter 7 provisions. 11 U.S.C. § 707(b). *Collier on Bankruptcy* points out that Congress was concerned with the abuse of consumer debt and that § 707(b) of the Code was adopted as "part of a package of consumer credit amendments" included in the Bankruptcy Amendments and Federal Judgeship Act of 1984. 6 *Collier on Bankruptcy* ¶ 707.LH[2], at 707-32 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.). Section 707(b) only applies to an individual debtor whose debts are "primarily consumer debts". In summary, Congress appears to have been concerned about persons who knowingly or recklessly live beyond their means, who live "high on the hog" and use the resources of their creditors to do so and then choose to walk away from their debts even though they have the financial ability to pay them and although their income levels may have given them the access to the credit markets which have made their liberal lifestyles possible.

The Fourth Circuit Court of Appeals has adopted a totality of the circumstances test in determining whether substantial abuse has occurred. *In re Green*, 934 F.2d 568, 570 (4th Cir. 1991). In *Green*, the Court listed a number of factors to be considered:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
> (5) Whether the petition was filed in good faith.

*Id.* at 570. The *Green* court further held that:

> Exploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors.

*Id.* at 572. The Court in *Green* further pointed out that a vast majority of circuit courts have held that the debtor's ability to repay is the primary factor to be considered. *Id.* District Judge Kiser of this District has recently analyzed *Green* in *In re Harrelson*, 323 B.R 176 (W.D. Va. 2005). This opinion offers a recent decision by a court to which an appeal from this court lies detailing how a motion pursuant to § 707(b) for alleged substantial abuse ought to be determined. This Court will undertake, therefore, to apply the methodology of that decision in deciding the present Motion.

In *Harrelson*, Judge Kiser emphasized that "the ability to repay, although not a dispositive factor, is the primary factor in determining substantial abuse." *Id.* at 179 (citing *Shaw v. U.S. Bankr. Adm'r*, 310 B.R. 538, 540-41 (M.D.N.C. 2004) and *In re Norris*, 225 B.R. 329, 333 (Bankr. E.D. Va. 1998)). Judge Kiser went on to note that *Green* requires courts to look at the totality of the circumstances and stated that a court "may not dismiss debtors' ability to repay debts as an irrelevant factor." *Id.* at 180. In fact, it should be the primary factor in determining

substantial abuse. *Id.* The Trustee argues that granting relief to the Chapmans would result in substantial abuse of Chapter 7 provisions.

*Petition filed as a result of a sudden illness, calamity, disability or unemployment*

The Court in *Harrelson* held that this factor weighs in favor of dismissal when the filing is not due to some "unforeseen tragedy." *Harrelson*, 323 B.R. at 178 (citing *In re Norris*, 225 B.R. at 333 and *In re Vansickel*, 309 B.R. 189, 211 (Bankr. E.D. Va. 2004)). A garnishment of one's salary is certainly a reasonable and common precipitating factor in the filing of a bankruptcy petition, but it cannot reasonably be said to constitute a "tragedy". Relief from such a garnishment can be obtained in a chapter 13 filing as well as one under chapter 7. Accordingly, this factor weighs in favor of the Motion.

*Whether the Debtors made consumer purchases far in excess of their ability to pay*

Case authority on this point varies widely. In *In re Vansickel*, 309 B.R at 211, the court held that "relatively modest" debts including $28,000 in unsecured debt did not weigh in favor of dismissal, holding that due to the statutory presumption in favor of granting a debtor bankruptcy relief, the Trustee did not meet his burden of proof in establishing substantial abuse. In *In re Norris*, 225 B.R. at 333, however, the court held that this factor did weigh in favor of dismissal when the debtors incurred more than $90,000 of unsecured debt, lived in an expensive home, dined out, and utilized their 401(k) plans to create a reserve fund for future expense. Additionally, another district court held this factor weighed in favor of dismissal when the debtors purchased a $4,000 bedroom suite, spent $1,000 a month for their daughter's college expenses, lived in a home they could not afford but were unwilling to leave, and purchased two new cars. *Shaw v. U.S. Bankr. Adm'r*, 310 B.R. 538, 540-41 (M.D.N.C. 2004). In the Chapmans'

-12-

case, these factors are more mixed. The amount of the unsecured debt is only about $27,000,

they do not live in an expensive home, and they have not utilized retirement savings plans to

protect financial assets from their creditors. Neither is there any indication that the Debtors took

cash advances on their credit cards. On the other hand, they purchased two new vehicles and

new furniture without any apparent concern for their existing consumer debt obligations and,

with respect to one of those vehicles and the furniture purchase, after a credit card company had

obtained a judgment against them, a judgment which resulted some months later in the

garnishment of Mr. Chapman's salary. The Debtors overextended themselves financially by

taking advantage of excessive consumer credit, much of which was incurred after Mrs. Chapman

had been compelled to leave the workforce due to her health problems, the precise problem

which § 707(b) is designed to address. Such debt proved to be in excess of their ability to pay it,

although to say that it was "far" in excess of their ability to pay is a much closer question.

Therefore, this factor weighs somewhat, but not heavily or decisively, in favor of finding

substantial abuse.

*Excessive and unreasonable family budget*

The U.S. Trustee's real argument on this factor is with respect to the finance

obligation for the Tacoma truck. The other living expenses are not challenged. Accordingly,

this factor weighs in favor of the Debtors.

*Accuracy of the Debtors' schedules*

The Court has found that there was a material understatement of the Debtors'

income reported on Schedule I, but that this understatement was not due to any effort or intent on

their part to mislead their counsel or the court. This is the only noted discrepancy in the

-13-

schedules and some explanation has been offered as to why and how it occurred. Nevertheless,

under the holdings in *Green* and *Harrelson* the fact of understatement of income is a factor to be

considered, regardless of intent to mislead. The Debtors are ultimately responsible for the

accuracy of the schedules they sign and submit to the court, even if the relevant circumstances

offer an explanation as to their good intentions. Therefore, the Court is bound to weigh this

factor in favor of the Motion, although again not heavily or decisively.

*Bad faith*

The Court concludes that no bad faith on the part of the Debtors in filing their

chapter 7 petition has been demonstrated. Therefore, this factor weighs against granting the

Motion.

*Ability to repay*

Courts have held that a debtor's ability to repay weighed in favor of a substantial

abuse finding when the debtors could only pay 29% and 47% of their debt over a period of

years.[3] *In re Harrelson*, 323 B.R. at 178 (citing *Shaw*, 310 B.R. at 540-41 and *In re Norris*, 225

B.R. at 333). In the analysis of this factor in this case, as discussed in the Findings of Fact

section of this Decision, the question turns on whether the ability to repay is to be determined

upon the assumption that the Debtors retain and continue to pay for the Toyota Tacoma pickup

truck, or conversely that they surrender the truck and utilize that payment to provide a

meaningful distribution to their unsecured creditors. The evidence is not sufficient for the Court

---

[3] According to *Collier on Bankruptcy*, Congress had in mind bankruptcy debtors who
could reasonably easily pay all of their obligations within a presumed three year period of a
typical Chapter 13 plan. 6 *Collier on Bankruptcy* ¶ 707.04[4], at 707-24 to -25 (Alan N. Resnick
& Henry J. Sommer eds., 15th ed. rev.). While this may well be true, this Court is bound to
apply the words of the statutory language as interpreted by appellate courts.

to determine whether an additional vehicle would be necessary for the Chapmans if they no

longer had the use of this truck. However that might be, the Court concludes that in the absence

of evidence that a luxury or wholly unneeded vehicle was purchased before the bankruptcy filing

or a vehicle was purchased in actual contemplation of a bankruptcy filing, requiring a debtor to

surrender a vehicle which he or she wants and intends to continue paying for to make more

money available for unsecured creditors is not justified in an alleged "substantial abuse" case.

This conclusion is based upon two premises. The first of these is that "substantial abuse" is not

demonstrated simply upon a showing that a chapter 7 bankruptcy debtor has made foolish

financial decisions or other life choices that appear misguided or even irresponsible to the United

States Trustee or the Court. *See In re Moreland*, 284 B.R. 825, 829 (Bankr. W.D. Va. 2002);

*In re Fenster*, No. 03-05002 , slip op. at 27 (Bankr. W.D. Va. July 14, 2005)(unpublished). The

second is that under the facts of this case the Court believes that it is highly likely that it would

confirm a chapter 13 plan proposed by the Debtors which provided for their retention and

payment for both vehicles. If that belief is accurate, there seems no good reason to consider a

repayment scheme based on surrender of the truck if the Court would not require such action as a

condition for confirmation of a chapter 13 plan containing such a provision. Therefore, this

factor weighs in favor of the Debtors.

*Other factors*

        The Court of Appeals's opinion in *Green* did not hold that the factors it

enumerated were exclusive or exhaustive. It adopted a "totality of circumstances" test which

called for consideration of factors "such as" the ones specifically listed. 934 F.2d at 572. No

other factor has been suggested by the parties in this case or recognized by the Court other than

the observation that the overall circumstances of the case support a conclusion that the Debtors'

Chapter 7 filing may be "abusive" only as to a few creditors rather than creditors generally.

Those creditors so affected are the ones which extended credit to the Debtors after one of their

creditors had taken judgment against them and the end of their unmolested days of indifference

to their accrued financial obligations was clearly in prospect to anyone of normal sensibilities.

### DECISION

Senior District Judge Kiser's holding in *Harrelson* that "ability to repay" is the

primary factor to be considered in an alleged "substantial abuse" case is fully in keeping with the

Congressional intent mentioned in *Collier* to preclude chapter 7 bankruptcy relief for those who

could pay their consumer loan debts without great hardship or even difficulty but instead would

prefer to walk away from their obligations. Similarly, if a debtor has no apparent ability to both

live and pay his creditors a meaningful portion of what he owes them, requiring him to proceed

under Chapter 11, 12 or 13 would serve no real purpose. It was not the intent of "substantial

abuse" to replace or provide a shortcut around the much more tightly defined grounds for

denying bankruptcy debtors a general discharge or discharge of particular obligations pursuant to

sections 727 and 523 of the Bankruptcy Code.

In this case the Court concludes that the Debtors do not have a meaningful ability

to pay their unsecured debt generally if they do what their Statement of Intention indicates they

intend to do, which is to pay their mortgage debt, vehicle debt, and furniture debt. By not

reaffirming their legal obligation to pay such debts, however, they leave themselves free to

change their minds and stop making payments in the future and allow the affected creditors to

repossess their collateral, perhaps after its value had been seriously depreciated. The Court

further concludes that the Debtors' chapter 7 bankruptcy filing is "abusive" as to the last three

obligations incurred by them before bankruptcy, those obligations being for the unsecured loan

obtained in October, 2004 from The Bank of Tazewell County, the obligation for the Toyota

Tacoma pickup truck incurred in November, 2004, and the obligation to Schewel's Furniture for

the buffet and hutch incurred in February, 2005. Accordingly, the Court will deny the United

States Trustee's Motion to Dismiss upon the following condition: within thirty (30) days of this

Decision the Debtors shall execute and file with the Court reaffirmation agreements for the just

noted obligations incurred in October and November of 2004 and February of 2005. In the event

of their failure to do so within such time, or to file a motion seeking an extension of time to

complete such condition or a motion to convert their case to one under Chapter 13 in order to

propose a repayment plan to their creditors consistent with their ability to pay, the case shall be

dismissed pursuant to the Motion. The Court recognizes that this disposition of the Motion is

unorthodox in that it does not simply grant or deny the same without conditions. The Court

concludes that it is the resolution, however, which is most in keeping with the Congressional

intent to permit chapter 7 bankruptcy relief where "substantial abuse" is not presented, but to

deny it when it is. While it is true that the words of the statute do not contemplate a conditional

denial of a substantial abuse dismissal motion, it is common for this Court to grant or deny

numerous kinds of motions upon conditions either agreed to by the parties or imposed by the

Court. The Court believes that a conditional denial of the United States Trustee's Motion is no

more inconsistent with the wording of the pertinent statute than its recognized ability, for

example, to discharge a portion but not all of an educational loan even though such a resolution

is not specifically provided for in the relevant statutory language of 11 U.S.C. § 523(a)(8). An

order to such effect shall be entered contemporaneously with the signing of this Decision.

This 31st day of March, 2006.

William F. Stone, Jr.

UNITED STATES BANKRUPTCY JUDGE